IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 07-20327 |
| Plaintiff, | HON. JULIAN ABELE COOK, JR |
| v. | |
| ANTONIO IVEZAJ - (D-2), | |
| Defendant. | |

## DEFENDANT'S SENTENCING MEMORANDUM

On September 16, 2008, pursuant to a Rule 11 Plea Agreement, Defendant Antonio Ivezaj entered a plea of guilty to Count Two of a First Superseding Indictment, Conspiracy to Commit Bribery in violation of 18 U.S.C. §§ 201 and 371. The sentencing guideline range set forth in the plea agreement is 27-33 months. At the time the parties executed the plea agreement and entered the plea, counsel for the government indicated to undersigned that it would be the government's position that a 27 month sentence would be an appropriate disposition of this matter.

The probation department calculated Mr. Ivezaj's guideline range at 33-41 months. This calculation is correct and varies from the plea agreement because of an additional criminal conviction that Mr. Ivezaj incurred in 1987 when he was 17 years old and that was not contemplated in the plea agreement. While the government has reaffirmed its previous position that a sentence at the bottom of the guidelines would be

appropriate, that bottom is now 33 months, which the government indicated to undersigned would be its position as to an appropriate sentence, given the change in the guideline range.

As set forth below, Mr. Ivezaj requests that, upon full consideration of all the factors set forth in 18 U.S.C. § 3553(a), the Court sentence below the advisory guideline range and impose a sentence of no more than 17 months imprisonment, which is the amount of time he has spent in jail awaiting resolution of this case.

### THE § 3553(A) FACTORS AND RELATED LEGAL PRINCIPLES

18 U.S.C. § 3553(a), "as modified by *Booker,* contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *United States v. Kimbrough*, 128 S.Ct. 558, 570 (2007), quoting § 3553(a)(2).  This so-called "parsimony provision [is the] guidepost for sentencing decisions post-*Booker*." *United States v. Ferguson*, 456 F.3d 660 (6th Cir. 2006). In arriving at this minimally sufficient sentence, "the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the Guidelines. . .  and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id,* quoting § 3553(a).  These factors, as applied to Mr. Ivezaj, are addressed below and weigh in favor of a sentence below the advisory guideline range.

THE GUIDELINES AND NATURE AND CIRCUMSTANCES OF THE OFFENSE

It is now well settled that the guidelines are merely advisory and that they are of no greater significance than any other factor identified in § 3553(a). See *Kimbrough v. United States*, 128 S.Ct. 558, 577 (2007); *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007)("The district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guideline sentence"). Moreover, the Supreme Court's companion opinions in *Kimbrough, Rita v. United States,* 127 U.S. 2456 (2007) and *Gall v. United States*, 128 S.Ct. 586 (2007) further clarified that any insight or advice to be gained from the guidelines becomes more attenuated the further the case is from the heartland of cases upon which the guidelines are premised:

> [I]n the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives. The sentencing judge, on the other hand, has greater familiarity with the individual case and the individual defendant before him than the Commission or the appeals court. He is therefore in a superior position to find facts and judge their import under § 3353(a) in each particular case.
>
> In light of these discrete institutional strengths,, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case outside the 'heartland' to which the Commission intends individual Guidelines to apply.

*Kimbrough,* 128 S.Ct. at 574-75, quoting *Rita,* 127 S.Ct. at 2465, and *Gall,* 128 S.Ct. at 586).

To understand why the advisory guideline range does not accurately reflect an appropriate sentence for Mr. Ivezaj, it is important to understand not only the facts

surrounding his involvement, but also the long history of official corruption that preceded his involvement and impacted his actions.

In one sense, the facts upon which Mr. Ivezaj's plea rests are quite simple. In August of 2003, Mr. Ivezaj, the owner of TMI Construction, performed less than $5,000.00 worth of miscellaneous construction services for Special Agent Roy Bailey who, at that time, was the Acting Field Office Director for the Department of Homeland Security-Immigration & Customs Enforcement (DHS-ICE) and was in charge of the office of Detention and Removal Operations (DRO) in Detroit. In this capacity, Agent Bailey supervised the custody and transportation of all aliens in this district pending the completion of their deportation proceedings and their removal from the United States. See PSIR, pg. 6, ¶ 11. At all times relevant, Mr. Ivezaj himself was under the supervision of the DRO, as he was on bond awaiting deportation to Yugoslavia as ordered by Immigration Court Judge Elizabeth A. Hacker. See Exhibit 1. Mr. Ivezaj agreed to perform these construction services (cabinet installation, landscaping, etc.) at Agent Bailey's residence and one of his rental properties after Agent Bailey indicated that such services would result in Mr. Ivezaj's cousin, who was being held in DHS-ICE custody pending his deportation, being released on bond. Indeed, once these construction services were completed, Agent Bailey arranged for Mr. Ivezaj's cousin, Gjon Cacaj, to be released on bond pending his deportation. Mr. Cajac had been ordered deported as a result of two state convictions for receiving and concealing stolen property for which he was sentenced to probation.

In order to place Mr. Ivezaj's action's in the proper context, however, it is important to understand the extent to which Agent Bailey had corrupted the DRO into a

vehicle for his personal aggrandizement by the time he met with Mr. Ivezaj and suggested the exchange of construction work for Mr. Cacaj's bond.

From the discovery materials produced in this matter and discussed below, it is clear that, during the time of Agent Bailey's supervision over the DRO (2000-2004), that office was governed not by the certainty and predictability of the federal statutes and administrative rules that are supposed to govern the processing of aliens and the operation of that office, but rather by Agent Bailey's personal whim and caprice.

The chaos at the DRO under Agent Bailey's reign came to light during a routine visit by DHS-ICE representatives from Washington D.C. in February of 2004. What started out as a scheduled review of the Electronic Tether Program quickly turned into a wholesale condemnation of virtually every facet of the Detroit office of the DRO, from the tyrannical manner in which Agent Bailey treated his staff, to the complete lack of standards or adherence to federal law in the processing of aliens' cases, to allegations of outright criminality. The DHS-ICE report that was generated after this review is attached hereto as Exhibit 2.

The allegations of misconduct in the DHS-ICE report, which the authors noted were too numerous to fully chronicle, ranged from Agent Bailey acquiring the homes of detainees and their families, to Agent Bailey "unethically and perhaps unlawfully" favoring the clients of attorney Namir Daman. *Id.* at pg. 2180-2181.

Most relevant to the present case is the allegation of "detainees paying money to be released," and an explanation, suggested by the report, for why the families of detainees would agree to pay money or otherwise circumvent the lawful immigration procedures set forth by federal law. In this regard, the report documented what was

already well known within the immigrant community - - that once an alien was detained in this district, he or she could languish in the system without regard to the established rules that their attorney's advised them *should* govern their cases:

> [I]t is apparent that the detained docket is in crisis. One major issue is that aliens are not getting responses to applications (stays, voluntary departures, bond requests). In addition, cases that are prepped for removal but awaiting travel documents appear to wait a substantial amount of time. Officers are not able to complete travel document requests in a timely manner for detained cases. It is not uncommon for cases to sit for months while awaiting an officer to apply for their travel document.
>
> The results of lengthy detention result in habeas actions, stays, and many complaints. *Attorneys are complaining that they are being grieved by their clients due to the lack of DRO response to their requests. One attorney complained that he is in jeopardy with the bar since he is unable to properly represent his clients within this district.*

*Id.* at 2180, emphasis added.

One reason the detained docket was in such disarray was Agent Bailey's interference in the Post Order Custody Review (POCR) process. As the name implies, a POCR is a review of the detained alien's case after a final order of deportation has been entered, and this review must occur before an alien can be released on bond pending his/her deportation. The DHS-ICE report noted:

> Another issue addressed was the Post Order Custody Reviews, or lack thereof as appears to be the case after reviewing the POCR program in Detroit. The officers are behind in this area, the interviews are not scheduled as required by the POCR guidelines, and the files are not being forwarded timely to the appropriate POCR unit at HQ. The protocol is that when a decision is rendered, the interim Field Officer Director, Roy Bailey reviews the case, and if he does not concur, he requires the officer to change his/her decision instead of merely overruling the officer with a no concur decision. The officers have stated their concerns about changing their review decisions in this manner.

*Id.*

In like vein, Immigration Detention Officer Ricardo Wong advised investigators that, under Agent Bailey's rule "aliens didn't receive a POCR [timely] and remained in custody beyond what they could legally be held without a POCR." See Exhibit 3, pg. 2831. Additionally, Agent Bailey's subordinate agents at the DRO recounted how he "abused his power in his position, was egotistical, hateful, spiteful and vengeful" (Exhibit 4, pg. 2920) and ruled the office like "his kingdom," (Exhibit 5, pg. 549) and "made every decision in the DRO" See Exhibit 2, pg 2181. According to these agents, when they questioned him about his improper conduct, Agent Bailey replied "I'm the boss, what I say goes," and reportedly wore a necklace proclaiming "I'm the Boss" to emphasize this point. See Exhibit 3, pg. 2827. Likewise, Agent Patrick Wynne, one of Agent Bailey's co-conspirators within the DRO, bragged that he could make sure someone was "lost in the system."[1] See Exhibit 6, pg. 449.

The investigation that ultimately followed in the wake of the DHS-ICE report also revealed that Agent Bailey was illegally using some of the aliens under the supervision of the DRO to complete renovations at his home and rental property and, at times, arranged these alien workers with the assistance of private immigration attorney Namir Daman. For example, see the following account of Alaa Toma, an Iraqi citizen who was detained by DHS-ICE at the Monroe County Detention Facility in June of 2003:

> Toma said he heard from other inmates in Monroe that private immigration attorney Namir Daman was a good attorney and had a close relationship with Roy Bailey.

---

[1] Agent Wynne was a DHS-ICE Detention Enforcement Officer and was assigned to be the Property Officer at the Monroe County Detention Facility in Monroe, Michigan. During the time of Agent Bailey's control over the DRO, Agent Wynne stole approximately $300,000.00 worth of personal property from aliens who were processed through the Monroe County Detention Facility. See *United States v. Patrick Wynne*, USDC EDM Case No. 05-80642, Docket Entry No. 7. Pgs 2-5. As detailed more fully *infra*, Agent Bailey facilitated Agent Wynne's theft of property from these detained aliens.

> \* \* \*
>
> Toma said that he was contacted by Daman several weeks after his release [on tether], and was asked by Daman if he could do him a favor by doing some landscape work at a house. . . in August or September 2003. Toma went to the house . . . [and] discovered that Roy Bailey was the owner of the house after Bailey showed up and began talking to his [Toma's] brother about the landscape work.
>
> Toma felt that if he did the landscape work for Daman and Bailey, Toma would get special treatment from Bailey. Toma believed if he refused to do the work, Daman and Bailey would have been able to remove him from the tether program.

Exhibit 7, pg. 2559-2560.

Agent Bailey's abuse of fellow staff and aliens alike was so bad that the authors of the DHS-ICE report feared that it could result in "congressional attention." Exhibit 2, pg. 2179.

Given the pervasiveness of the problems at the Detroit DRO, and the apparent eagerness of the other agents in the office to report these abuses to the DHS-ICE representatives from Washington D.C., it begs the question – how was Agent Bailey able to abuse his position, staff and the aliens under his control for so long without detection or correction? The answer appears to lie, at least in part, in a bureaucratic absurdity worthy of a Kafka novel. As the DHS-ICE report noted, when the agents tried to go outside the Detroit DRO to report the conditions within the office, "the complaints were returned to the district for investigation by the person or persons that were reported as the violators." *Id* at 2180. In fact, the subordinate agents within the DRO were so frustrated with the official reaction, or lack thereof, to their complaints that they "submitted a query through Congressman Carl Levin's office, and seriously considered going to the media for lack of apparent action within the district regarding the officers involved in the allegations." *Id.* at 2182.

It is against this backdrop that the August 2003 interaction between Mr. Ivezaj and Agent Bailey occurred. While Mr. Ivezaj knew the arrangement with Agent Bailey for the release of his cousin on bond was improper, he, like the others who reportedly paid money to be released and many others within the various immigrant communities, knew the system in Detroit was, at best, unpredictable and could result in prolonged detentions. When even the immigration attorneys practicing in this district complained that they could not effectively represent their clients due to the lawlessness imposed on the DRO by Agent Bailey, and given DHS-ICE's own infectiveness at addressing the complaints it received and ferreting out this rampant misconduct, it is little wonder that the aliens themselves, and their families, agreed to become involved in extrajudicial arrangements to obtain relief from this system. These facts take the present case out of the mine-run of bribery cases upon which the guidelines are premised and, therefore, render the advisory guideline range an inadequate gauge of an appropriate sentence for Mr. Ivezaj. *Kimbrough,* 128 S.Ct. at 574-75.

THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT - § 3553(A)(1)

The Presentence Investigation Report accurately recounts Mr. Ivezaj's personal background, employment history and family circumstances. What it does not capture is Mr. Ivezaj's charitable nature and his commitment to his family. In the various letters of support attached hereto as Exhibit 8, Mr. Ivezaj's family members and others from the community do just that. For example, Luke Juncaj, Chairman of the Albanian American Association, writes that Mr. Ivezaj "has been a valuable member of our non-profit organization" and "has donated money and time to help the most unfortunate members of our community." Likewise, Suzy Camaj recounts her personal observations of Mr.

Ivezaj's charity and writes that he has "dedicated his time a church festivals" and "volunteered his time on Christmas Eve serving food" at the church. A defendant's charitable works, especially the donation of time rather than money, is a permissible consideration in the Court's sentencing calculus. See *United States v. Cooper*, 394 F.3d 172, 173-174 (3rd Cir. 2005) (in securities fraud and tax evasion case, with sentence range of 14-21 months, four-level departure to a sentence of probation was warranted for defendant's good works that entailed "hands on personal sacrifices which have a dramatic and positive impact on the lives of others").

At the time of his involvement in the present offense, Mr. Ivezaj was not married and had no children. That changed in 2004 when he married his wife, Sophija, and their daughter, Anna Marie, was born less than a year after they wed. In her letter, Mrs. Ivezaj details the impact Mr. Ivezaj's incarceration has had on her and their now three-year-old daughter: "Since he left, I barely have enough money to pay for the basic necessities such as food, clothing and shelter and a car for me and my daughter. Without my husband, I was forced to turn in my car to the dealership and our home is in foreclosure simply because I could not afford to continue paying the payments." See Exhibit 8. Likewise all of those who wrote on his behalf attest to Mr. Ivezaj's dedication to his wife and daughter and his angst over his inability to support them since his arrest in this matter. *Id*.

Another important aspect of Mr. Ivezaj's background is that, as the Presentence Report notes, he is not a United States citizen and he has already been ordered deported. This has resulted in a DHS-ICE detainer being lodged against him that has caused him to be detained throughout the course of these proceedings, and he will

likely be deported upon his completion of this Court's sentence. Like many bureaucratic processes, the process of deporting a defendant after he has completed his criminal sentence is not a speedy one. While this process no doubt varies from case to case, undersigned's recent experience with a Canadian citizen resulted in a delay of approximately four months from the time that the individual completed his state court sentence to his actual removal from the United States.[2]

Unfortunately for Mr. Ivezaj, his case appears to be a little more complicated than average and may result in a longer delay. While his final order of deportation indicates that he is to be deported to Yugoslavia, there is some question as to his citizenship in that country, as he was born in a refugee camp in Naples, Italy after his parents left Yugoslavia, but before they immigrated to the United States. For this reason, the deportation order indicates that "alternatively," Mr. Ivezaj should be deported to Italy. See Exhibit 1. Whether either country will ultimately accept him, and exactly how long it will take the United States, Yugoslavia and Italy to resolve these issues, is unknown. While this Court cannot control the deportation process that awaits Mr. Ivezaj, it can take into account the time he is likely to spend in DHS-ICE custody after his sentence as he awaits his removal. See *United States v. Camejo*, 333 F.3d 669, 677 (6th Cir. 2003) (Court held that the trial court was empowered to depart downward to give credit to defendant for two years he spent in INS custody pending trial because the guidelines do not forbid this factor and recognizing that "what little case law there is on the subject makes clear that district courts *can* depart downward on the basis of factors relating to immigration-related factors"), emphasis in original; *United States v. Montez-Gaviria*, 163

---

[2] See *People of the State of Michigan v. Nikola Djurdjevic,* Macomb County Circuit Court Docket Nos. 06-000565-FH; 06-000306-CF.

F.3d 697, 701 (2d Cir. 1998) (district court can depart downward for time defendant spends in INS custody where it is not credited elsewhere, "nothing in the Sentencing Guidelines precludes the district court from departing downward under §5K2.0 on the basis of [the defendant's] uncredited time served in state custody [on INS detainer]"). While the cases in which courts have taken a defendant's immigration-related custody into account in fashioning the criminal sentence have generally involved pre-sentence custody, the same rationale supports consideration of the incarceration that the defendant inevitably faces upon completion of his criminal sentence.

THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY - § 3553(A)(2).

The key word here, of course, is unwarranted. *United States v. Newson*, 428 F.3d 685, 689 (7th Cir. 2005)("we begin with the observation that § 3553(a) does not ban all disparities; its concern is only with unwarranted disparities"); *United States v. Simmons*, 501 F.3d 620, 623-24 (6th Cir. 2007). Unwarranted sentencing disparity means not only avoiding disparate sentences among similarly situated defendants, but also avoiding "unwarranted *similarities* among other co-conspirators who were not similarly situated. See *United States v. Gall*, 128 S.Ct. at 600, emphasis in original.

In a mathematical anomaly only the Federal Sentencing Guidelines could produce, Mr. Ivezaj's guideline range (33-41) is *greater* than Agent Bailey's (30-37 months). This, despite the fact that Agent Bailey pleaded guilty to multiple offense public corruption offenses and that the factual basis for his plea demonstrates that he consistently abused his position as Director of the DRO over a four year period by: 1) corruptly assisting fugitive business owner Talal Chanie in obtaining immigration benefits for his employees and associates; 2) conspiring with private immigration

attorney Namir Daman to corruptly favor his clients by providing them immigration and naturalization benefits in exchange for cash and construction services performed by Mr. Daman's clients; and 3) using his power and authority to intentionally divert FBI attention and suspicion away from DHS-ICE Agent Wynne, who was engaged in the ongoing theft of personal property from detained aliens in excess of $300,000.00.  See Exhibit 9, pgs. 4-11.  It should also be noted that, for his conduct herein, attorney Namir Damon was sentenced to 36 months probation by this Honorable Court for his plea of guilty to marriage fraud in Case Number 07-20590.

In stark contrast, Mr. Ivezaj's plea to a single count of conspiracy to commit bribery rests upon conduct that was fleeting in comparison to the sustained and systematic abuse of power perpetrated by Agent Bailey.  While undersigned acknowledges that Mr. Ivezaj's guideline range was increased significantly due to his prior criminal record, this fact alone cannot justify the imposition of a sentence upon him that is greater than or even similar to Agent Bailey's sentence.  This is especially so since Agent Bailey sought out those aliens with prior records to perform his personal construction services.   By definition, all, or nearly all, of the aliens being supervised by Agent Bailey's office, like Mr. Ivezaj, had criminal records that subjected them to deportation.  No doubt one of the reasons that this aspect of Agent Bailey multi-faceted corruption of the DRO went undetected was that the people he selected as his personal workers were aliens with criminal records who likely feared refusing him or reporting him to other authorities because of their criminal records and its impact on their immigration status.  That Agent Bailey was calculating enough to target such individuals cannot justify a more lenient, or even similar, sentence for him than for Mr. Ivezaj.

If nothing else, the inverse sentences recommended by the Guidelines for Mr. Ivezaj and Agent Bailey demonstrate the fundamental truth of the observation that "[i]f the 600-plus pages of the most recent set of sentencing guidelines have taught us anything, it is that punishment cannot be reduced to an algorithm." *United States v. Meyers*, 353 F.Supp. 2d 1026, 1027 (S.D. Iowa 2005), quoting the Hon. Myron H. Thompson, Editorial, *Sentencing and Sensibility,* N.Y. Times, Jan. 21, 2005.

THE NEED FOR THE SENTENCE TO REFLECT THE TRADITIONAL PURPOSES OF SENTENCING - § 3553(A)(2).

The statutory factors that require the court to consider the need for the sentence to "reflect the seriousness of the offense, . . . promote respect for the law, and provide just punishment for the offense," § 3553(a)(2), essentially echo the traditional concepts and purposes of punishment. The "traditional purposes of punishment . . . include retribution, rehabilitation, prevention of further crimes by the defendant, and deterrence of the defendant and others who might contemplate committing similar crimes. *Hobbs v. County of Westchester*, 397 F.3d 133, 158 (2d Cir. 2005),citing 1 W. LaFave, Substantive Criminal Law § 1.5(a)(2d ed. 2003).

DETERRENCE & RETRIBUTION- Section 3553(a)(2)(B) directs the sentencing court to weigh the effect the defendant's sentence will have as a "deterrence to criminal conduct." With respect to the need to deter Mr. Ivezaj from committing any future crime, that goal has already been accomplished by the 17-month separation from his wife and daughter he has suffered while in jail on this matter.

As for the need for a more general deterrent to others, this goal is intertwined with the considerations set forth in § 3553(a)(2)(A) that directs the sentencing court to weigh the need "to reflect the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense." *Id.* While these considerations echo the traditional concept of retribution, they do not counsel in favor of retribution for its own sake. Indeed, as the Supreme Court recognized in *Gall*, a "sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." This would be precisely the effect of any sentence imposed upon Mr. Ivezaj that is greater than or even similar to Agent Bailey given their vastly differing conduct.

<u>R</u>EHABILITATION – In assessing the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," as required by §3553(a)(2)(D), it is clear that, for Mr. Ivezaj, there is no need to incarcerate him to ensure that he has the education or vocational skills needed to be a productive member of society upon his release. Mr. Ivezaj was educated in the United States through the 11th grade and graduated high school while in Europe. Additionally, as the owner of a construction company, he has the vocational skills necessary to provide for his wife and daughter. He has no drug or alcohol problem and, therefore, no need for any treatment or counseling in this regard.

<u>I</u>NCAPACITATION - The traditional notion of incapacitation is codified in § 3553(a)(2)(C) - "the need to protect the public from further crimes of the defendant." There appears little need to incarcerate Mr. Ivezaj to protect the public at large because, as those who wrote on his behalf attest, his singular desire is to return to his wife and daughter and live a law abiding life so that he will never again be separated from them.

WHEREFORE, Defendant respectfully requests that this Honorable Court impose a sentence not to exceed 17 months imprisonment.

Respectfully submitted,

_____/s/ Michael Kemnitz_____
MICHAEL J. KEMNITZ (P57227)
Attorney for Defendant Antonio Ivezaj
645 Griswold, Suite 1717
Detroit, Michigan 48226
(313) 967-0100
mkemnitz@sbcglobal.net

Dated: March 2, 2009

CERTIFICATE OF SERVICE

  I hereby certify that on February 5, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

  Bruce C. Judge
  Assistant United States Attorney
  211 W. Fort Street, Suite 2001
  Detroit, MI 48226
  bruce.judge@usdoj.gov


        /s/ Michael Kemnitz
       MICHAEL J. KEMNITZ (P57227)
       Attorney for Defendant Antonio Ivezaj
       645 Griswold, Suite 1717
       Detroit, Michigan 48226
       (313) 967-0100
       mkemnitz@sbcglobal.net